UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )     Cr. No. 03-10220 MEL
          v.                       )
                                   )
3. CATHERINE BUCCI, et al.         )
     Defendant.                    )

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS FOR VIOLATION OF STATUTE OF LIMITATIONS

     The United States of America, by its attorneys, United
States Attorney Michael J. Sullivan, and Assistant U. S. Attorney
Peter K. Levitt, hereby opposes the defendant's motion to dismiss
the Second Superseding Indictment (the "Indictment") for
violation of the statute of limitations.

I.     **FACTUAL BACKGROUND**

     The government alleges that, from the mid 1990s until his
arrest in June 2003, Sean Bucci was a large scale drug trafficker
who made hundreds of thousands of dollars selling marijuana and
who had only minimal legitimate income.  The Indictment alleges
that, from in or about January, 2002, and continuing thereafter
until on or about June 4, 2003, Sean Bucci was involved in a
conspiracy to distribute over 1,000 kilograms of marijuana.
Bucci, Darren Martin, and Anthony Belmonte were arrested on June
4, 2004, after Belmonte delivered a load of marijuana to Bucci at
his residence at 23 Marshall Street, North Reading, MA
(approximately 450 pounds were seized by DEA, over 300 of which
was in Bucci's car).

The only legitimate job Bucci had during this time was that he was the owner and operator of a small disc jockey business called "911 Productions" in which he and some of his childhood friends worked as disc jockeys. Corporate tax returns were never filed for 911 Productions and the anticipated testimony at trial was that Bucci and his friends used the business to make money to pay their bar tab and meet girls, and that the business where they operated, Bay Bridge Nightclub, paid 911 Productions $15,000 over three years. In October 2001, Bucci filed an individual tax return for 1999 reporting $9,101 in earnings from employment as a disc jockey as his only income. In 201, Bucci filed an individual income tax return for 2000 reporting a taxable gain of approximately $70,000 for the sale of property at Alderbrook Drive (property purchased with the proceeds of illegal drug trafficking) as his only taxable income. He failed to file individual tax returns for 1998, 2001, 2002, and 2003.

So Bucci had a problem. Lots of cash income and no legitimate source of income to hide that illegal cash. The Indictment alleges that Bucci's mother, Catherine Bucci ("Catherine"), agreed to help him hide that money. This was the purpose of the money laundering conspiracy: to engage in real estate and other financial transactions "(i) to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity,

to wit, the distribution of marijuana, as alleged in Counts One and Two, and (ii) to avoid a transaction reporting requirement under State and Federal law, in violation of 18 U.S.C. § 1956(a)(1)."  Indictment ¶ 8.

Bucci's choice of Catherine to help him launder hundreds of thousands of dollars was not a particularly good one since she had no legitimate income of her own.  As alleged in the Indictment, from at least tax year 1998 until at least tax year 2002, Catherine filed joint income tax returns with her husband in which she listed her occupation as housewife and reported no income attributable to herself for each tax year.[1]

The defendant's motion provides no factual background whatsoever and simply points out the post-August 11, 2000 transactions in isolation and argues that they are "benign".  The facts, however, show that the post-August, 2000 transactions were part of the continuing conspiracy to conceal or disguise the illegal source of Bucci's cash.  The Indictment describes, in great detail, how Bucci and Catherine attempted to conceal or disguise the proceeds of Bucci's drug peddling business.  The Indictment describes many of the acts committed in furtherance of the conspiracy to conceal the nature, location, or source of Bucci's illegally derived cash.  Some of them are repeated herein

---

[1] Catherine's husband, William Bucci, worked as a clerk at a liquor store and his reported income during these years was, depending on the year, between $21,000 and $25,000 per year.

3

since they provide an overview of the sordid story.

4.  Beginning in or about May 1998, **Sean Bucci** regularly provided cash proceeds derived from his drug trafficking activity to **Catherine M. Bucci**, who caused the proceeds to be deposited into her own bank accounts to allow **Sean Bucci** to invest in real estate and pay creditors without revealing the illegal nature of his income.

5.  In or about June 1999, **Catherine M. Bucci** opened a nominee bank account at SIS Family Bank in Middleton, Massachusetts (which was subsequently acquired by Banknorth, N.A.) (herinafter, "SIS Family Bank"), into which large sums of cash proceeds derived from **Sean Bucci**'s drug trafficking activity were deposited, and which was used by **Sean Bucci** to make mortgage and other monthly payments to his creditors.

             *       *       *       *       *

7.  From on or about June 1, 1998, through on or about December 26, 2002, **Sean Bucci**, **Catherine M. Bucci**, and others acting on their behalf, structured cash transactions with [SIS Family Bank, Salem Five Savings Bank, Warren Five Cents Savings Bank (which was subsequently acquired by Banknorth, N.A.), and Beverly Cooperative Bank] by breaking up $95,700 in cash and converting it into Cashier's, Treasurer's, or personal checks, which were used to acquire real property for the benefit of **Sean Bucci.**

             *       *       *       *       *

18.  On or about May 29, 1998, defendant **Sean Bucci** attended an auction of the Marshall Street Property, and used $10,000 of proceeds from the sale of marijuana to secure the highest bid of $287,000.00 to purchase the property.

19.  On or about May 30, 1998, defendant **Catherine M. Bucci** made material false statements on a mortgage application for a loan in the amount of $229,600.00 from a domestic financial institution in order to acquire the Marshall Street Property, including:

    a.  Falsely stating that the Marshall Street Property would be used as the primary residence of defendant **Catherine M. Bucci**;

      b.    Falsely stating that 4 Loris Road, Danvers, Massachusetts, (the actual primary residence of defendant **Catherine M. Bucci**) would be used as rental property, providing additional income needed to qualify for the loan;

      c.    Falsely stating that **Catherine M. Bucci** was employed by defendant **Sean Bucci**'s disc jocky business, 911 Productions, earning $20,000 per year as a bookkeeper;

      d.    Falsely stating that **Catherine M. Bucci** had been so employed for a period of four (4) years;

      e.    Falsely stating that her husband earned $57,600 per year as a manager at Simpson's Package Store, Beverly, Massachusetts;

      f.    Falsely stating that **Catherine M. Bucci** had $60,000 cash savings in a safe deposit box, which would be used for the down payment on the loan needed to purchase the Marshall Street Property; and

      g.    Falsely listing the $10,000 illegal cash drug proceeds, which **Sean Bucci** paid to auctioneer W. Todd Finn on May 29, 1998, as an asset of **Catherine Bucci.**

    20.  On or about June 5, 1998, **Sean Bucci** obtained a safe deposit box at the Danvers, Massachusetts, branch of Fleet Bank (which was subsequently acquired by Sovereign Bank) in the names of **Sean Bucci** and **Catherine M. Bucci,** into which he deposited $60,000 of cash proceeds from his drug trafficking activity in order to assist **Catherine M. Bucci** and her husband in qualifying for the loan used to purchase the Marshall Street Property.

    21.  On or about the following dates, **Catherine M. Bucci** made the following cash deposits into three different accounts held by **Catherine M. Bucci:**

| | **DATE** | **DEPOSIT** | **DEPOSITOR** | **BANK** | **ACCOUNT** |
|---|---|---|---|---|---|
| a. | 06/01/98 | $8,000.00 | **Catherine M. Bucci** | Salem Five Savings Bank | **Catherine M. Bucci**, Account No. 042062745 |
| b. | 06/25/98 | $8,500.00 | **Catherine M. Bucci** | Salem Five Savings Bank | **Catherine M. Bucci**, Account No. 042062745 |
| c. | 06/26/98 | $9,500.00 | **Catherine M. Bucci** | Salem Five Savings Bank | **Catherine M. Bucci**, Account No. 042062745 |
| d. | 06/26/98 | $9,500.00 | **Catherine M. Bucci** | Warren Five Cents Savings Bank | **Catherine M. Bucci**, Account No. 0008000922 |

22.  On or about the following dates, **Catherine M. Bucci** purchased Cashier's Checks in the following amounts, which were used in the purchase of the Marshall Street Property:

| | **DATE** | **AMOUNT** | **BUYER** | **BANK** | **ACCOUNT** |
|---|---|---|---|---|---|
| a. | 06/25/98 | $15,540.00 | **Catherine M. Bucci** | Salem Five Savings Bank | **Catherine M. Bucci**, Account No. 042062745 |
| c. | 06/26/98 | $9,500.00 | **Catherine Bucci** | Salem Five Savings Bank | **Catherine M. Bucci**, Account No. 042062745 |

| | | | | | |
|---|---|---|---|---|---|
| d. | 06/26/98 | $9,500.00 | **Catherine Bucci** | Warren Five Cents Savings Bank | **Catherine M. Bucci**, Account No. 0008000922 |

23.  On or about June 12, 1998, **Sean Bucci** and **Catherine M. Bucci** accessed the safe deposit box at Fleet Bank, along with a representative from World Savings and Loan Association, who photographed the $60,000 in illegal cash proceeds, which **Sean Bucci** had deposited into the safe deposit box on June 5, 1998.

24.  On or about June 26, 1998, defendant **Catherine M. Bucci** signed a Settlement Statement at the closing for the acquisition of the Marshall Street Property, wherein she provided approximately $58,960.00 in cash and cash equivalents, of which funds approximately $41,420.00 had been previously structured.

25.  On or about June 10, 1999, **Catherine M. Bucci** opened Account No. 802-0308090 at SIS Family Bank into which **Sean Bucci** and **Catherine M. Bucci** regularly deposited large amounts of cash, derived from **Sean Bucci**'s illegal trafficking of marijuana, for the benefit of **Sean Bucci** and the payment of **Sean Bucci**'s creditors.

26.  On or after June 10, 1999, **Catherine M. Bucci** provided **Sean Bucci** with pre-signed checks from her SIS Family Bank Account No. 802-0308090 for the benefit of **Sean Bucci** and the payment of **Sean Bucci**'s creditors.

27.  On various dates between June 10, 1999, and January 6, 2003, **Catherine M. Bucci** and **Sean Bucci** caused at least $118,000.00 to be deposited and $117,998.00 to be withdrawn from **Catherine M. Bucci**'s Account No. 802-0308090 at SIS Family Bank.

28.  Between on or about July 1998 and on or about May 2003, **Catherine M. Bucci** and **Sean Bucci** caused multiple significant payments to be made against the mortgage on the Marshall Street Property, using proceeds derived from **Sean Bucci**'s sale of marijuana, including payments totaling approximately $258,625.25.

29.  On or about October 9, 1999, **Catherine M. Bucci** made material false statements on an application for a loan in the amount of $260,000.00 from World Savings and Loan Association, a domestic financial institution, in order to refinance the original mortgage on the Marshall Street Property, for a new loan

that provided cash back at closing, in order to facilitate the acquisition of a second piece of property by **Sean Bucci**, including:

     a.    Falsely stating that 23 Marshall Street, North Reading, Massachusetts, was her current primary residence;

     b.    Falsely stating that 4 Loris Road, Danvers, Massachusetts, was her former residence;

     c.    Falsely stating that **Catherine M. Bucci** was employed by defendant **Sean Bucci**'s disc jockey business, 911 Productions, earning $48,000.00 per year as a bookkeeper;

     d.    Falsely stating that **Catherine M. Bucci** had been so employed for a period of five (5) years; and

     e.    Falsely stating that her husband earned $60,000 per year as a manager at Simpon's Package Store, Beverly, Massachusetts.

30. On or about November 2, 1999, **Sean Bucci** and **Catherine M. Bucci** attempted to make a cash deposit of $10,000.00 at the Middleton, Massachusetts, branch of SIS Family Bank.

31. On or about November 2, 1999, defendant **Catherine M. Bucci**'s husband made the following cash deposits into his and **Catherine M. Bucci**'s joint Account No. 53003109 at Beverly Cooperative Bank:

| | DATE | TIME | DEPOSIT | BRANCH |
|---|---|---|---|---|
| a. | 11/02/99 | 11:34 a.m. | $9,000.00 | Main Office, Cabot Street, Beverly, MA, Beverly Cooperative Bank |
| b. | 11/02/99 | 12:15 p.m. | $9,000.00 | Branch Office, Dodge Street, Beverly, MA, Beverly Cooperative Bank |

32. On or about November 2, 1999, defendant **Catherine M. Bucci**'s husband also made the following purchases of Treasurer's Checks through his and **Catherine M. Bucci**'s joint Account No.

53003109 at Beverly Cooperative Bank, which were used in **Sean Bucci**'s purchase of the Alderbrook Drive Property:

| | DATE | TIME | TREASURER'S CHECK AMOUNT | BRANCH |
|---|---|---|---|---|
| a. | 11/02/99 | 11:34 a.m. | $9,000.00 | Main Office, Cabot Street, Beverly, MA, Beverly Cooperative Bank |
| b. | 11/02/99 | 12:15 p.m. | $9,000.00 | Branch Office, Dodge Street, Beverly, MA, Beverly Cooperative Bank |
| c. | 11/02/99 | 3:54 p.m. | $5,000.00 | Main Office, Cabot Street, Beverly, MA, Beverly Cooperative Bank |

33.   On or about November 3, 1999, **Sean Bucci** and **Catherine M. Bucci** made the following cash deposits into **Catherine M. Bucci**'s Account No. 8020308090 at SIS Family Bank:

| | DATE | TIME | DEPOSIT | BRANCH |
|---|---|---|---|---|
| a. | 11/03/99 | 1:18 p.m. | $9,000.00 | Middleton, MA, Branch, SIS Family Bank |
| b. | 11/03/99 | 2:10 p.m. | $9,000.00 | Peabody, MA, Branch, SIS Family Bank |

34.   On or about November 3, 1999, **Sean Bucci** and **Catherine M. Bucci** also made the following purchases of Cashier's Checks through **Catherine M. Bucci**'s, Account No. 8020308090 at SIS Family Bank, which were used in **Sean Bucci**'s purchase of the Alderbrook Drive Property:

| | DATE | TIME | CASHIER'S CHECK AMOUNT | BRANCH |
|---|---|---|---|---|
| a. | 11/03/99 | 1:18 p.m. | $9,000.00 | Middleton, MA, Branch, SIS Family Bank |
| b. | 11/03/99 | 2:10 p.m. | $9,000.00 | Peabody, MA, Branch, SIS Family Bank |

35.  On or about November 3, 1999, **Catherine M. Bucci** signed a Settlement Statement at the closing for the refinancing of the mortgage on the Marshall Street Property, wherein she received approximately $44,400.03 in cash, which was used in **Sean Bucci**'s acquisition of the Alderbrook Drive Property.

36.  On or about November 9, 1999, **Catherine M. Bucci** and **Sean Bucci** caused a cash deposit of $9,500.00 to be made into **Catherine M. Bucci**'s Account No. 042062745 at Salem Five Cents Savings Bank, followed by the purchase of a Cashier's Check in the same amount, which was used in **Sean Bucci**'s acquisition of the Alderbrook Drive Property.

37.  On or about November 10, 1999, **Sean Bucci** purchased the Alderbrook Drive Property for $465,000.00, including making a cash payment of approximately $126,956.96 at the closing.

38.  On or about July 19, 2000, **Sean Bucci** opened Checking Account No. 824-0004593 in his own name at First Massachusetts Bank, which was subsequently acquired by Banknorth, N.A. (the "First Massachusetts Account").

39.  Approximately one (1) week later, on or about July 26, 2000, **Sean Bucci** sold his investment property at 10 Alderbrook Drive, Topsfield, Massachusetts, yielding a gain of approximately $222,000.00.

40.  On or about July 28, 2000, **Sean Bucci** deposited approximately $222,179.88 into his First Massachusetts Account, at which time virtually all of the banking activity and payment of creditors of **Sean Bucci** that was previously made through **Catherine M. Bucci**'s nominee account at SIS Family Bank shifted to **Sean Bucci**'s new First Massachusetts Account.

41.  On or about April 15, 2001, **Sean Bucci** filed an Individual Income tax return for the fiscal year 2000, reporting a taxable gain of approximately $70,000.00 from the sale of the Alderbrook Drive Property, as his only taxable income for that year.

42.  On or about October 2, 2001, **Sean Bucci** filed an Individual Income tax return for the fiscal year 1999, reporting $9,101.00 of earnings from employment as a disc jockey as his only taxable income for that year.

43.  **Sean Bucci** failed to file Individual Income tax returns for fiscal years 1998, 2001, 2002 and 2003.

44.  On or about the following dates in December 2002, **Sean Bucci** and **Catherine M. Bucci** made the following cash deposits into **Catherine M. Bucci**'s Account No. 8020308090 at SIS Family Bank:

|     | DATE       | AMOUNT      |
|-----|------------|-------------|
| a.  | 12/18/02   | $5,000.00   |
| b.  | 12/20/02   | $4,000.00   |
| c.  | 12/23/02   | $4,000.00   |
| d.  | 12/26/02   | $1,700.00   |
|     | **TOTAL:** | $14,700.00  |

45.  On or about December 20, 2002, **Sean Bucci** caused Check No. 1382 from his First Massachusetts Account to be made payable to "A & B Consulting," a fictitious entity, in the amount of $3,000.00, falsely indicating in the memo section of the check that the money was in payment of "consulting" services, when such check served to pay for controlled substances in connection with **Sean Bucci**'s illegal trafficking of marijuana.

46.  On or about December 27, 2002, after making the foregoing cash deposits into **Catherine M. Bucci**'s account at SIS Family Bank, which totaled $14,700.00, **Sean Bucci** and **Catherine M. Bucci** made Check No. 138 payable to World Savings and Loan Association in the amount of $14,382.89, in payment of one (1) monthly mortgage payment on the Marshall Street Property, plus approximately $13,000.00 against the principal balance on the loan.

## II.  LEGAL LANDSCAPE AND ARGUMENT

There is a five-year statute of limitations for money laundering charges so, as the defendant points out, the critical date is August 11, 2000.[2]  In arguing that the conspiracy ended before that date, the defendant's motion relies entirely on two cases -- <u>United States v. Upton</u>, 352 F.Supp.2d 92 (D.Mass.2005),

---

[2] <u>See generally</u> <u>Grunewald v. United States</u>, 353 U.S. 391, 396-97 (1957).

and <u>United States v. LaSpina</u>, 299 F.3d 165 (2002).  Ironically, both of these cases *rejected* statute of limitations arguments. Moreover, both of these cases actually demonstrate why Catherine Bucci's motion should be denied.

A.    <u>The December 2002 Transactions</u>

In December 2002 (two years after August 11, 2000), Bucci and Catherine deposited a total of $14,700 into Catherine's account at SIS Family Bank as follows:  $5,000 (December 18, 2002), $4,000 (December 20, 2002), $4,000 (December 23, 2002), and $1,700 (December 26, 2002).  A day after the final deposit, on December 27, 2002, Bucci and Catherine withdrew $14,382.89 to pay one months mortgage payment on Bucci's residence at 23 Marshall Street, North Reading, MA, plus approximately $13,000 against the principal balance on the loan.[3]

---

[3] The defendant's motion states that this was to pay "her" mortgage at 23 Marshall Street in North Reading.  This is a false statement.  The financial documents provided in discovery to Catherine's counsel unequivocally show that its Bucci's mortgage at 23 Marshall and that he is the one who has been paying it, as well as utility payments and other payments, with money first deposited in cash, usually structured, in Catherine's bank accounts.  The evidence in this case clearly shows that 23 Marshall Street was purchased in 1998 by Bucci, using Catherine and her husband on the documents, for his residence, and that Catherine and her husband never intended to and never moved out of 4 Loris Road in Danvers.  Bucci was residing at 23 Marshall Street when he was arrested in 2003 and a host of witnesses will testify that that was his residence.  Similarly, a host of witnesses will testify that Catherine and her husband remained living at 4 Loris Road, where all the bills remained in their names.

The defendant argues that these transactions "were not done in furtherance of the alleged conspiracy and they exceed the scope of the alleged conspiratorial argument." Deft's Motion at 3. The defendant argues that the Second Circuit's decision in LaSpina supports this contention: "The charge that was dismissed in LaSpina was a $118,000 bank withdrawal, similar to the December 2002 transactions in Catherine Bucci's Family Bank account, but involving a lot more money. Just as the bank transaction in LaSpina was deemed benign and not in furtherance of the conspiracy, the court should hold the same when considering the charged conduct against Mrs. Bucci." Deft's Motion at 5.

No charges in LaSpina were "dismissed" (or found to violate the statute of limitations). To the contrary, the Second Circuit found that the $118,000 bank withdrawal *was in furtherance of the conspiracy*. The court's reasoning is instructive.

LaSpina, like this case, involved a money laundering conspiracy under 18 U.S.C. § 1957. Much of the activity in the case took place outside the 5-year statutory period and the issue on appeal was whether certain transactions, like the $118,000 withdrawal, which took place within the 5-year period, were within the scope of the conspiracy.

The court began its analysis by framing the question to be addressed. "[T]he crucial question in determining whether the

statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." LaSpina, 299 F.3d at 173 (quoting Grunewald, 353 U.S. at 397). The court refined this inquiry as follows:  "We therefore 'focus on the essence of the underlying illegal objective to determine' the scope of the conspiracy."  Id. (quoting United States v. Stavroulakis, 952 F.2d 686, 690 (2d Cir.1992)).

     The DeSpina court rejected the government's argument that the Second Circuit's holding in United States v. Monaco, 194 F.3d 381 (2d Cir.1999), supports the proposition that the scope of a conspiracy includes any transaction involving the criminally derived property.  Id. at 175.  The DeSpina court first reiterated that, "[i]n Monaco, we noted that a conspiracy to launder proceeds from drug trafficking and piracy was within the statute of limitations even though the monetary transactions in furtherance of the laundering conspiracy were made *as many as twelve years after the drug trafficking and piracy ended*."  Id. (emphasis added).[4]

_____

     [4] Defendant offers no legal support for his argument that a couple years of inactivity in the SIS Family bank accounts somehow means the December 2002 transactions should not be considered within the scope of the conspiracy.  As Monaco demonstrates, the caselaw is to the contrary.

The court went on to explain as follows.

> The _Monaco_ defendants continued until then to commit acts in furtherance of their conspiracy "_to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity,", viz., drug trafficking and piracy_. Contrary to the government's reading of _Monaco_, the monetary transactions were not deemed to be within the scope of the conspiracy simply because they involved the drug trafficking and piracy proceeds. The transactions were deemed part of the conspiracy because they furthered the original aims of the conspiracy, to "conceal" and "disguise" the "nature, source, the ownership or control" of the proceeds. _Monaco_, therefore, like _Krulewitch_ and _Grunewald_, analyzed the aims of the conspiracy to determine whether a specific act fell within its scope.

_Id._ (internal citation omitted).

The _DeSpina_ court ultimately concluded that the object of the conspiracy in that case was economic and concluded that, where the object of a conspiracy is economic, "the conspiracy generally 'continues until the conspirators receive their anticipated economic benefits.'" _Id._ (quoting _United States v. Mennuti_, 679 F.2d 1032, 1035 (2d Cir.1982)). Based on this analysis, the _DeSpina_ court found that several activities, including the withdrawal of $118,000 by one of the conspirators, was within the scope of the conspiracy and therefore that the money laundering conspiracy was not time barred. _Id._ at 176-77.

In this case, like _Monaco_, the object of the conspiracy was to conceal or disguise "the location, the source, the ownership, or the control of the proceeds of specified unlawful activity,"

15

-- i.e., Bucci's drug trafficking money.  So any activities done by any of the co-conspirators after August 11, 2000, to conceal or disguise the location, source, or ownership of Bucci's drug money was in furtherance of the conspiracy.

The December 2002 deposit of $14,000 into Catherine's account, and the subsequent withdrawal to pay the mortgage and principle on Bucci's residence at 23 Marshall, plainly was done to conceal the fact that the money was coming from Bucci's drug business, to give it the legitimacy of Catherine's bank account, and to maintain the facade that Catherine owned the house at 23 Marshall.[5]

This is precisely the analysis that the court employed in Upton -- the other case strangely relied on by the defendant -- in rejecting a motion to dismiss on limitations grounds.  In that case, the question was whether the filing of a false tax return in 2000 for fiscal year 1999, which failed to disclose stolen money, was in furtherance of the crime of conspiracy to commit money laundering, and therefore extended the conspiracy into 2000 for purposes of the statute of limitations.  United States v. Upton, 352 F.Supp.2d 92, 98 (D.Mass.2005).  The court concluded

---

[5]  The SIS Family Bank account, of course, is one of the accounts that Bucci and Catherine used throughout the conspiracy to launder money.  From June 1999 through January 2003, Catherine and Bucci deposited at least $118,000 into this account and withdrew $117,998.  Indictment ¶ 27.

that "failing to report stolen money to the IRS is in furtherance
of the central crime of laundering the money." Id.[6]

Bucci had the drug trafficking money in this case.  He had
achieved the anticipated economic benefit.  His problem was how
to legitimize all that cash -- i.e., how to conceal its location,
source, and ownership.  With respect to the December 2002
transactions, he and his mother devised a way for him to pay his
mortgage, and $13,000 in principle, by funneling the money
through Catherine's bank account, thus "cleansing" it.  Grunewald
v. United States, 353 U.S. 391, 396-97 (1957) (noting that there
are certain crimes for which the scope fo the conspiratorial
agreement must include acts of concealment, because "the
successful accomplishment of the crime necessitates
concealment"); United States v. Mann, 161 F.3d 840, 859 (5th
Cir.1998) (holding that "acts of concealment are 'part of the
central itself' where 'the purpose of the main conspiracy . . .
by its very nature, called for concealment'") (citation omitted).

Catherine argues that the December 2002 somehow should not
be considered because the "[r]esults from the handwriting

---

[6] The Defendant's Motion also suggests, without directly
arguing, that the "small" nature of the December 2002
transactions somehow mitigates against them being considered
within the scope of the conspiracy.  The defendant offers no
legal support for this suggestion and the government is aware of
none.  It should also be noted that $14,700, in relation to
William and Catherine Bucci's 2002 gross earnings, makes up over
66% of their 2002 gross earnings (approximately $22,000), which
passed through her bank account in one week.

exemplar prove that Mrs. Bucci did not conduct these transactions [and] [s]he had no knowledge of said bank deposits, nor did she have knowledge as to the amount of the mortgage payment."  Deft's Motion at 3.[7]  This argument is legally irrelevant to the statute of limitations issue and belied by the facts.

As the court made clear in LaSpina in rejecting just such an argument, "while conspirators must agree on the 'essential nature' of the conspiracy, they 'need not agree on every detail of their venture.'" DeSpina, 299 F.3d at 176 (citation omitted). See also United States v. Stavroulakis, 952 F.2d 686 (2d Cir.1992) (noting that "[t]he policies underlying conspiratorial liability could easily be thwarted by the careful compartmentalization of information, and 'conspirators would go free by their very ingenuity,' if it were required that they agree on all details of the scheme") (quoting Blumenthal v. United States, 332 U.S. 539, 557 (1947)).

Bucci and Catherine "had agreed to launder the proceeds of [Bucci's drug dealing] scheme.  They did not have to agree further on the details of each transaction in furtherance of their objective." DeSpina, 299 F.3d at 176.  Moreover, the December 2002 transactions "were part of a series of transactions

---

[7] This last is a rather curious statement given the insistence, earlier in the defendant's motion, that the December 2002 transactions were to pay "her" mortgage.  See, supra, footnote 2.

made throughout the life of the conspiracy and thus part of a single ongoing agreement." Id. First, Bucci received large amounts of cash for drug dealing, then Bucci and Catherine deposited the cash into Catherine's bank accounts, then Bucci wrote checks from those accounts to pay, among other things, his mortgage and other bills at 23 Marshall Street, his credit card bills, and for trips to Aruba. The facts that Bucci and Catherine still had this account open in December 2002 demonstrates "the conspirators' continued involvement with [the drug money] and with each other." Id. See also Braverman v. United States, 317 U.S. 49, 53 (1942) (an overt act may be made by "only a single one of the conspirators and need not be itself a crime").[8]

The argument is also factually specious. The handwriting exemplar results show strong indications that Bucci wrote the $14,382 check to the mortgage company (from December 2002) but that he was not the signatory on the check. Rather, the handwriting exemplar suggest that Catherine was the signatory on the $14,382 check to the mortgage company.

---

[8] Indeed, a review of the activity in this account demonstrates that its sole purpose was for Bucci and Catherine to deposit cash and then for Bucci to withdraw said cash. From June 1999 through January 2003, Catherine and Bucci deposited at least $118,000 into this account and withdrew $117,998. Indictment ¶ 27.

For the foregoing reasons, the December 2002 transactions were within the scope of the conspiracy and the defendant's motion should be denied.

> B.    Additional Transactions with Five-Year Statute of Limitations

Sean Bucci is charged in the Indictment with several counts of tax evasion that took place after August 11, 2000.  See Indictment Counts 14-17.  As in Upton, these acts of concealment were in furtherance of the money laundering conspiracy and, as noted above, it matters not that they were done by a different member of the conspiracy.  What matters it that Bucci and Catherine had an agreement to conceal the nature, location, and source of Bucci's drug trafficking, the natural result of which would be the failure to report said income on his tax returns. See Mann, 161 F.3d 840, 859 (5th Cir.1998) (holding that "acts of concealment are 'part of the central itself' where 'the purpose of the main conspiracy . . . by its very nature, called for concealment'").  See also DeSpina, 299 F.3d at 176 ("while conspirators must agree on the 'essential nature' of the conspiracy, they 'need not agree on every detail of their venture'").

In addition, on October 2, 2001, $5,125 in cash was deposited into Catherine's account at Warren Five Cents Savings Bank and Catherine wrote a check to Laughlin Homes for siding on Catherine's residence at 4 Loris Road in Danvers.  On October 3,

2001, $5,125 in cash was deposit into Catherine's SIS Family Bank account and Catherine subsequently wrote a check to Laughlin Homes (on October 24, 2001), again for siding installation at 4 Loris Road. These deposits were structured in violation of federal law (they have not been charged to date). Neither Catherine nor William Bucci had the income to raise $10,000 in cash in two days. The natural inference is that this was drug money Bucci gave to Catherine to deposit in her account, this time on the rare occasion for her use rather than his. These transactions, done in violation of federal law, are further post-August 11, 2000, transactions made in furtherance of the conspiracy to conceal or disguise the nature, source, and location of Bucci's drug trafficking money.

## CONCLUSION

For these reasons, the defendant's motion should be denied.

Respectfully Submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s PETER K. LEVITT
PETER K. LEVITT
Assistant U.S. Attorney

Date: September 9, 2006